## THE C. E. TURNER.
## THE ATHENS.
## THE CREE.

### NEW YORK TRAP ROCK CORPORATION v. LEHIGH VALLEY R. CO. et al.
### No. A. 15591.

District Court, E. D. New York.
March 26, 1940.

Hagen & Eidenbach, of New York City (Henry C. Eidenbach, of New York City, of counsel), for libelant.

Pyne & Lynch, of New York City (Warner Pyne and O. Taft Nelson, both of New York City, of counsel), for Lehigh Valley R. Co.

Purdy & Lamb, of New York City (John E. Purdy, of New York City, of counsel), for Conners Marine Co., Inc.

BYERS, District Judge.

The owner of the scow "C. E. Turner" seeks to recover for damages sustained by her on the afternoon of November 8, 1938, as the result of contact between her port side forward, about 25 to 30 feet aft of the bow, and the port stern corner of the Lehigh Valley Railroad Company carfloat No. 2011, in the North River off the Cement Dock which lies between the Lehigh Valley float bridges to the north and the ferry slips of the Central Railroad Company of New Jersey on the south, on the New Jersey side of the river.

The fact of damage has been shown, and the only question for decision is whether it was caused by the negligence of diesel tug "Cree" operated by the claimant Conners Marine Co., Inc., and having the "Turner" in tow, or the Lehigh Valley tug "Athens" which was maneuvering the carfloat preparatory to taking her in tow, near the place of collision.

The time of the happening was 2:53 p. m.; the weather was clear, and an ebb tide was flowing, of the agreed strength of one and one-half miles an hour, and there was a southerly wind the average velocity of which was twenty-one miles during the hour between 2:00 and 3:00 o'clock, with a maximum of twenty-seven miles sometime during that interval.

The libelant's scow "Turner" was the second of three vessels of that type having the same dimensions, namely, 110 feet in length, 34 feet in beam, and sides that were 10 feet, 6 inches high.

They were being towed by the "Cree", which is about 70 feet long, 19.3 feet in beam, and having 450 horse power. The tug had 65-foot hawsers out; that is to say, there was that space between her stern and the bow of the first scow. The three scows were closely coupled, so that the unit was fairly rigid.

The tow had been made up at Elizabethport and all the vessels were light, and the destination was the Cornell stakeboat in the North River at about 75th Street.

There can be no doubt that, as this tow approached the ferry slips of the Central Railroad Company of New Jersey, she was closer thereto than to the center of the stream. Such was the testimony of the bargee on the "Turner" and of all witnesses who observed the position of the tow, called on the part of the "Athens"; two of those witnesses were disinterested, namely, Reynolds, the captain of a New Haven tug lying at the Cement Dock, and Maire, the captain of one of the Jersey Central ferryboats which was lying in No. 4 (next to the lowest) of the Jersey Central ferry slips. He was in a good position to observe the approach of the "Cree", and testified that he saw her headed upstream, at about 300 feet off the Jersey Central float bridges (which are south of the slips), and that is accepted as establishing the approximate position of the "Cree" when she was about 1,000 feet southerly from the Lehigh Valley float bridges from which the tug "Athens" and the Lehigh Valley carfloat No. 2011 were soon to emerge.

The course of the "Cree" and her tow was necessarily altered almost at once because of an incoming Jersey Central ferryboat with which a port passing was arranged by whistle signals, and that is found to have taken place at about 600 feet off the Jersey Central ferry slips. This means that of necessity the course of the "Cree" and her tow at that time was on a heading toward Cortlandt Street, or diagonally across in a northeasterly direction from the Jersey Central ferry slips.

Up to this point, the testimony is not in dispute; the "Cree" then resumed her heading up the river and this involved a change in her course, because at no time did she approach the center of the river. It should be said here, that the only testimony for the "Cree" is that of her captain, Rohde; his version of events proved to be so freely adjustable by him during cross-examination as to constitute his evidence a very unreliable basis upon which to decide the issues.

The fact is that, almost immediately after the heading of the "Cree" was changed, the second barge in her tow, the "Turner", came in contact with the carfloat and the responsibility for that occurrence lies either with the "Cree" because of her faulty navigation, or with the "Athens" in charge of the carfloat, because the latter was permitted to come out into the stream under circumstances which, as the "Cree" contends, pointed to the peril of such a maneuver.

The "Athens" is 104 feet long by 26½ feet in beam, with 1,000 horse power; she entered the slips of the Lehigh Valley float bridges for the purpose of taking the carfloat No. 2011 in tow for delivery of her nineteen loaded freight cars at Long Island City, immediately prior to the incidents in controversy.

The No. 2011 is a steel carfloat, 325.7 feet long by 40 feet in beam. She carried nineteen loaded freight cars and was lying at the float bridge No. 3 (down river from bridges Nos. 1 and 2), and the "Athens" had to maneuver her out before making fast alongside in towing position, because there were two New Haven carfloats at bridges Nos. 1 and 2 where they had just been delivered by the New Haven tug "Transport No. 14". The latter tug, having completed her delivery, came out of the slips and took a position on the south side of the Cement Dock, the location of which has been stated. Her captain, Reynolds, was in the pilot house and was in a position to observe the approach of the "Cree" and her tow.

The "Athens" took up position on the downriver side of carfloat No. 2011 which was lying with her bow (toggle-end) inshore, and put a line on a bitt on the port side about 20 feet forward of the stern (bumper-end), preparatory to getting the carfloat out where there would be room to enable the "Athens" to get alongside in a towing position and affix her towing strap.

The testimony is not disputed that she could not do that while the carfloat lay at No. 3 bridge, because the New Haven floats at bridges Nos. 1 and 2 to the south projected so far alongside the No. 2011 that there was not room to permit of the desired make-up until the float had been hauled somewhat offshore.

Having made fast the line as stated, the "Athens" blew a long slip whistle to announce her intended movement, and at the time that she did so her captain observed the "Cree" and her tow, as he says, at about 900 or 1,000 feet down the river, and the only possible criticism of the "Athens" would lie in the fact that, in spite of that observation, the movement presaged by the slip whistle was actually undertaken.

I cannot find that this was a fault, for the reason that the expectable course of the "Cree" was not so close to the pier-ends as to interfere with the necessary movement of the carfloat, and that this is true will be seen from the fact that almost at once the "Cree" changed her course as has been stated, in order to accomplish the port passing with the inbound Jersey Central ferryboat.

The "Athens" and the No. 2011 moved out into the stream to a distance not to exceed 450 feet; this was not a steadily maintained movement. The testimony of the men who handled the lines is that she was "babied" out; that is to say, she would move a few feet and stop, and then a few feet more. And that had to be so since she was not on a steady course and would not be until the towing strap had been adjusted and the tow firmly made up for its destination.

It should be said that even Rohde, the captain of the "Cree" admitted that he knew the foregoing to be the fact because the float could not be towed on the single line which he observed being handled on the "Athens" and the float; and that, when he first observed the "Athens", he knew she was coming out, and blew one whistle to indicate that he intended to pass astern of the No. 2011 as she lay. He said he did this when he was about off the Cement Dock, which is manifestly untrue, if he means to refer to a time prior to his port passing of the inbound Jersey Central ferryboat—since the Cement Dock lies north of the ferry slips, and south of the Lehigh Valley float bridges.

It is found that the contact between the float and the "Turner" was caused by the change in heading of the "Cree" and her tow, which was initiated too soon, in view of the strength of the wind which took effect on the high sides of the vessels in tow of the "Cree". The speed of the latter was stated by her captain to be 7 miles over the ground even against the ebb tide, and other witnesses estimated it at 4 and 5 miles an hour. The "Cree's" answer indicated that she increased her speed following the port passing with the Jersey Central ferryboat, but on the witness stand her captain denied any such change in engine movement. He said that she was at all times making 7 miles over the land, and it is clearly to be seen from the testimony that he miscalculated the capacity of his tug to make the two swings of his tow,

first to starboard to accomplish the port passing referred to, at about 600 feet offshore, and then to port to resume his heading up the river, in time to avoid contact on the part of his tow with the No. 2011.

The evidence shows the fact to have been that the vessels in tow of the "Cree" did not follow her change of course promptly but were affected by the wind striking their starboard high sides so that they were swept somewhat toward the New Jersey shore and thus the "Turner" was brought into contact with the No. 2011.

Before that took place, the "Athens" blew an alarm and had brought the No. 2011 to a stop and was actually pulling her back toward the New Jersey shore, and her toggle-end was off the Cement Dock at the time of the impact, her bumper-end having been somewhat swept down the river by the tide.

The "Cree" must be held at fault, and the "Athens" exonerated, as this court views the evidence.

The captain of the "Cree" did not tell a consistent story on the witness stand: Among other things, he first said that the No. 2011 was from 900 to 1,000 feet out in the stream. Again he said that he understood she was on a course across the river, and then:

"A. Well, I didn't know whether she was or wasn't on her course. She was just going promiscuously out in the river."

Again:

"Q. Would you say she was made fast in such shape that she could proceed on a course? A. No, sir, she was not.

"Q. Then you knew she was not on her course, did you? A. Yes, sir. You cannot steer a boat on one line.

"Q. And you realized that at the time? A. Yes, sir."

His attitude on the witness stand and the general nature of his testimony created the belief that, having observed the "Athens" and the carfloat, he made up his mind that he would order them to remain at the float bridges until he had passed, and that he persisted in that determination even after he was forced to change his heading to accomplish the port passing with the inbound Jersey Central ferryboat, and it was his false assumption of a right to dominate the navigation in the immediate waters which was responsible for the happening. He was too close to the pier-ends in the first place, but that error would have

been overcome, had he not resumed his upriver course so abruptly, as the evidence demonstrated that he did.

The conclusion therefore is that the "Cree" must be held solely at fault and the "Athens" must be exonerated.

The libelant is to have the usual decree with costs as against the "Cree", and the claimant Lehigh Valley Railroad Company is to be exonerated, but without costs.

If findings in more detailed form are desired, they may be settled on notice, with the decree.